415 F.2d 393
 ATLANTA & SAINT ANDREWS BAY RAILWAY COMPANY, Individually,
and for the Use and Benefit of Northwestern
National Insurance Company, Plaintiff-Appellee,
v.
CHILEAN NITRATE SALES CORPORATION, Defendants and Third
Party Plaintiff-Appellant, v. SMITH STEVEDORING &
FORWARDING COMPANY, Inc., Third Party
Defendant-Appellant.
 No. 26655.
 United States Court of Appeals Fifth Circuit.
 Aug. 19, 1969.
 
 Dempsey J. Barron, Benjamin W. Redding, Panama City, Fla., for Chilean Nitrate Sales Corporation.
 Charles Cook Howell, Jr., Charles Cook Howell, III, Howell, Howell & Tygart, Jacksonville, Fla., for appellant Smith Stevedoring & Forwarding Co., Inc.
 Charles S. Isler, Jr., Lynn C. Higby, Isler, Welch, Bryant, Smith & Higby, Panama City, Fla., for appellee Atlanta & Saint Andrews Bay Railway Co.
 Before TUTTLE and SIMPSON, Circuit Judges, and CASSIBRY, District judge.
 TUTTLE, Circuit Judge:
 
 
 1
 This appeal by the defendant below, Chilean Nitrate Sales Corporation and a cross-defendant, Smith Stevedoring & Forwarding Company, Inc., challenges the correctness of the trial court's granting summary judgment which determined that Chilean, the lessee of the building leased to it by Atlanta and Saint Andrews Bay Railway Company, was liable for the cost of repairing fire damage to the building and equipment covered by the lease. Having found by summary judgment that the lessee was liable, the trial court, by consent of the parties, fixed the amount of damages separately as to the equipment destroyed by the fire and as to the warehouse building itself.
 
 
 2
 The trial court made no judgment over against the third party defendant, nor did the court submit to a jury or decide itself whether the third party defendant was liable for the amount of the judgment. Nevertheless the third party defendant, Smith, joins with the lessee as appellant in the action, doubtless anticipating that if the judgment stands, it will ultimately have to defend itself against the cross complaint.
 
 
 3
 Atlanta and Saint Andrews Bay Railway Company owned a warehouse and docking facilities together with certain ship unloading machinery and equipment which was used in connection with the unloading of shipments of nitrate of soda fertilizer at dockside and the storing of the products in the warehouse.
 
 
 4
 About the basic facts causing a loss there is no real dispute. The railway (Bay Line) leased the building and equipment to Chilean by written lease which contained two paragraphs that are essential to our consideration of the case here. These are the paragraphs 4 and 7.[1]
 
 
 5
 Chilean's vessels would bring in the nitrate from South America; they would dock in the water adjacent to the warehouse; and there they would be unloaded by Smith Stevedoring & Forwarding Company's crew under an agreement between Smith and Chilean. This agreement, also in writing, had a provision dealing with the matters here in controversy under paragraph 7.[2] The unloading by Smith was accomplished by means of a chain link belt bucket elevator system by which the nitrate would be carried up into the top of the warehouse and there distributed for bagging and transportation to consumers. Over the course of the years, the bucket elevator system at the warehouse had become badly worn. From time to time Bay Line undertook to replace worn out links in the chain. Shortly before the casualty that gave rise to the litigation, a dispute arose between Chilean and Bay Line as to whether the bucket elevator system was merely in a state of bad repair which was repairable or whether it was, within the terms of the paragraph 4 of the lease in such condition that 'ordinary repair shall not be sufficient to maintain' under which circumstances Bay Line 'shall make replacement with equipment and machinery of like kind and quality and good working condition.' There was ample evidence submitted to the trial court in connection with the motions for summary judgment to the effect that the Bay Line had itself determined that replacement was necessary and that nevertheless it had declined to make the replacement.
 
 
 6
 On October 25, 1963, a vice president of Chilean wrote the president of Bay Line a letter which was admittedly received by the latter on October 28, in which Chilean demanded installation of new parts for the 'worn out parts of the elevator.' The letter went ahead and said, 'since we have scheduled a vessel to discharge at Panama City on or about November 4, the elevator must be in good working order by that date in order that there be no delay in discharge through breakdown of that equipment. Such a delay could prove costly and must be avoided. Accordingly, we instructed Mr. Smith (this was Smith of the Smith Stevedoring & Forwarding Company, Inc.) to obtain the parts immediately necessary and to proceed with their installation, both acts to be for your account.' Smith proceeded to work on the elevator installation, but no further word was heard from the railroad until after the occurrence of the fire on October 30. This fire occurred while Smith's men were about their work at the bottom of the wooden shaft housing the chain link bucket elevator system and while they were using an acetylene cutting torch. The fire inflicted heavy damage to the building and the equipment as well.
 
 
 7
 As appears from the record of the case, Bay Line's insurance carrier, Northwestern National Insurance Co., paid a substantial amount of the claim, whereupon Bay Line rebuilt the building and installed new equipment and it then sued Chilean on its own account for the excess amounts expended by it, and sued for the benefit of the insurance company which, it claimed had subrogation rights against the defendant.
 
 
 8
 The complaint initially was based on an alleged negligent act of Chilean, through the principle of respondeat superior for Smith's conduct in setting fire to the building; later amendments to the complaint sought recovery on the basis of a contractual liability of Chilean to respond, without regard to negligence. The trial court withheld action on the negligence feature of the case and construed the several provisions of the contract, in light of the actions of the parties, as imposing liability on Chilean as a matter of law to reimburse the landlord for the total outlays both to the warehouse and to the equipment. In doing so, the trial court ruled as a matter of law that the worn out links of the elevator chain were not of such a nature as to require their total replacement by the landlord, as contended by Chilean, but that as a matter of law the repairs called for were within the provisions of the lease requiring them to be performed by the tenant, Chilean.
 
 
 9
 Moreover, the trial court held that it would be immaterial whether there had been a breach by the landlord of its obligation to furnish new equipment as a replacement for worn out chain since, as the trial court held, such agreement by the landlord would be independent of the obligation assumed by the tenant to 'return in good condition, normal wear and tear excepted, all machinery and equipment thus provided.' The trial court held, in effect, that the tenant, through its 'agent' Smith, having (albeit, for the sake of argument, innocently) destroyed the equipment, it had placed itself beyond the power to comply with this term of the lease and, although the term of the lease had not expired and there is no allegation in the complaint that there had ever been any demand made upon the tenant to return the equipment in good condition, the court held that the destruction of the equipment was sufficient to warrant the court's holding that there had been a breach of that part of paragraph 4 of the lease, thus making the tenant liable for the cost of replacement.
 
 
 10
 With respect to the damage to the warehouse itself, the trial court held that the last sentence in paragraph 4 (which paragraph primarily deals with equipment), obligated the lessee to pay for the rebuilding of the entire warehouse because that paragraph said, 'The Lessee, however, shall not be obligated for any repairs to the building, dock and rail lines during the term of this lease, except that the lessee shall be liable for any damage thereto caused by any of its employees or agents.'
 
 
 11
 The trial court found there was no substantial issue that would prevent it from deciding that Smith was an 'agent' of Chilean which had, 'caused' damage to the building within contemplation of the language of paragraph 4 of the lease and that, therefore, Chilean had by its contract agreed to be responsible for this injury, that is, the loss of the warehouse by fire.
 
 
 12
 In its appeal here, supported by Smith, the cross defendant, urges several persuasive points.
 
 
 13
 The first, and most persuasive, argument made here is that, no matter what the final outcome of the case may be, the issue of liability was not ripe for determination by the trial court on motion for summary judgment. The trial court fully recognized that the issue of negligence, of course, would require a hearing on the facts. Such a hearing was, however, obviated when the trial court determined that liability could be fixed against the tenant, Chilean, by virtue of the naked language of the contracts. The complaint of Chilean here on this point is that there were at least three issues of fact that the trial court should have submitted to the jury before Chilean could be cast in the law suit. The first of these arises from Chilean's contention that under the plain terms of Section 4 of the contract it became Bay Line's duty to replace the worn out elevator chains and links because they were no longer in a state to be suitable for piecemeal repair; that the failure of Bay Line to make this repair, at a time when there was an emergency situation which would cause substantial damage to Chilean[3] made it necessary for Chilean to take on the burden of substituting new equipment for old or to make out the best it could in the circumstances; that, since it was doing this job, which was really the responsibility of the landlord, the work on the chain performed by Smith at Chilean's direction was, in fact, work performed by Smith for Bay Line; thus, any damage to the equipment and to the building itself caused by Smith's use of the torch was not legally chargeable to the tenant because Smith was acting not as its 'agent' but was acting as the loaned agent of Bay Line. The question whether the equipment was in such condition as to require renewal by Bay Line is claimed to be an issue of fact.
 
 
 14
 A second point urged here deals with the question of whether the damage to the warehouse, amounting to a total loss by fire, following the use of the torch by Smith, was damage caused by 'an employee or agent' of Chilean. The trial court found that there was no substantial issue of fact, but that it should decide as a matter of law that Smith was such 'agent.' This one issue has produced many pages of discussion in all the briefs filed by the several parties to the litigation. Here, there are two questions. The first has been discussed above. That is, whether Smith was acting on behalf of Chilean, which company directed that the work be done, or was acting as a loaned agent of Bay Line, whose duty Chilean claims it was, to perform the work under the particular circumstances present at the time the injury occurred. This is posed as an issue of fact.
 
 
 15
 The other question is whether Smith was the 'agent' of Chilean, even though the first theory fails and Chilean is found to have been responsible for having the work done. Chilean contends that the word 'agent' as used in paragraph 4 of the contract must be viewed as if the court were concerned with a distinction between an agent on the one hand and an independent contractor on the other. Chilean contends that there is nothing in the contract to indicate that the word 'agent' was used in a generic sense which would comprehend the work performed for Chilean by an independent contractor.
 
 
 16
 In order to dispose of the simple issues as quickly as possible, we conclude that the trial court correctly determined that if the performance of the work was the responsibility of Chilean then under the undisputed testimony of Smith's activities at the instance of Chilean, Smith was the 'Agent' of Chilean within the contemplation of the terms of 4 of the contract. It would make no difference whether Smith was an independent contractor or an agent whose manner of performance was within Chilean's control.
 
 
 17
 The next contention made by the appellant here is that even though the trial court could find either by summary judgment or after a finding of fact by the jury, that Chilean was responsible for the loss of the equipment under paragraph 4, because of its inability to return the equipment at the end of the lease, reasonable wear and tear excepted, the trial court could not find Chilean liable for the loss to the warehouse from the fire (the more substantial item of damages) because, Chilean contends, that when the entire lease contract is taken and considered together, the parties intended to make full provision dealing with any nonnegligent loss by fire to the warehouse by the provisions of Section 7, quoted in footnote 1 above. This argument runs that paragraph 4, as we have pointed out above, deals primarily with the equipment, and deals in the last sentence with the building only for purposes of relieving the tenant of any obligation of normal repairs to the building such as was required as to the machinery. It is the lessee's contention that the words 'any damage thereto caused by employees or agents' refer to any damage caused to the buildings other than loss by fire, which subject is totally pre-empted by the provisions of paragraph 7 dealing both with substantially total and with partial destruction by fire, under both of which circumstances paragraph 7 says the lessor shall be responsible for rebuilding or abating the rent.
 
 
 18
 We consider, first, the trial court's finding of liability against Chilean because of the provision of section 4 of the contract that it would 'at the expiration of the lease, return in good condition, normal wear and tear excepted, all machinery and equipment thus provided.' The court found that there was no question but that this would be impossible, because the machinery and equipment had been destroyed by the fire. The court thus found that the lessee should pay for the value of this equipment. To the lessee's argument that its inability to return the original equipment at the end of the lease was not its fault but was the fault of the lessor, because the lessor had failed to carry out its agreement to install new equipment, but for which failure, everything would have been all right, the court says, first, that it was not the duty of the lessor to furnish new equipment because the court found as a matter of law that the equipment was not in such shape that 'ordinary repair shall not be sufficient to maintain it' and the court then found that even though it had been in such condition the lessor's failure to carry out its obligation did not excuse the lessee's loss of the equipment during its nonnegligent efforts to remedy this defect, because the lessor's obligation to furnish new equipment was entirely independent of the lessee's obligation to return the provided equipment at the end of the lease.
 
 
 19
 As to these findings we conclude that the trial court erred in two respects. In the first place, the question whether the machinery and equipment was or was not in such shape that ordinary repair was sufficient to maintain it was clearly an issue of fact. Moreover, it was an issue of fact as to which there was much evidence to support the contention of the lessee; sufficient, in any event, to make it inappropriate for the trial court to resolve the issue as a question of law.
 
 
 20
 Second, it is difficult to consider circumstances under which two provisions of a contract could more appropriately be considered dependent than these provisions. They were both within the same paragraph, and both dealt with the obligations of the two parties dealing with what was to happen with respect to equipment and machinery that was leased, both during the term of the lease and upon its expiration. Whatever fine distinctions may sometimes be drawn between dependent and independent covenants (See 17A C.J.S. Contracts 3441(b) pp. 331-334, citing inter alia Nolan v. Lunsford, 142 Fla. 671, 196 So. 193, 128 A.L.R. 649 (Fla.1940)) we are compelled to conclude that the duty or obligation of the lessee here to return this equipment and machinery in good condition, normal wear and tear excepted, was absolutely dependent upon the lessor's performing its duty to make such replacements as in fact were required under the same section of the contract or, upon its failure to perform its duty thereabout lose its right to complain after the lessee had taken the necessary steps (non-negligently, it must be remembered, for the purpose of this discussion), to make up for the default of the lessor. Although it is not expressly suggested by the parties, it may well be that a finder of fact could be asked whether such non-negligent damages to the equipment in such circumstances would not actually fall within the ambit of 'reasonable wear and tear' especially if the landlord was insisting that the equipment was repairable.[4]
 
 
 21
 The sum and substance of the matter is that if in fact the lessor here failed to make replacements when required under the terms of the agreement, the trial court could not legally find the lessee liable solely because the fire (non-negligent, be it remembered) made it impossible for the lessee to return the original machinery in good working condition, when the fire occurred in an effort by the lessee to make up for the default of the lessor. Thus it is that the trial court should have submitted to the fact finder, the issue whether this machinery and equipment was, as contended by the lessee, in such shape that the duty fell on the lessor to replace it. In the event of such a finding, then no liability could devolve upon the lessee on the basis determined by the trial court, that is, on the basis of the terms of paragraph 4 of the lease.
 
 
 22
 We also conclude that there was ample evidence before the trial court at the time of the motion for summary judgment to warrant a finding that the actions by Smith were, in fact, the actions of Bay Line, if the findings just discussed above are in favor of the lessee. Florida law, in common with the general rule, is that a tenant placed in such a position as Chilean was here has the right to minimize loss to himself and incidentally, damages to the other party to the lease by supplying deficiencies that are the responsibility of the lessor to supply, Rosen v. Needelman, 83 So.2d 113, 114 (Fla.1955) and see Masser v. London Operating Co., 106 Fla. 474, 145 So. 79, 84. In doing so, the relationship of principal and agent can arise between the lessor and the person performing the services, given adequate notice and acquiescence, and assuming that the services to be performed are reasonably calculated to minimize damages that would result if the work were left undone by the tenant. In view of the evidence before the court of the relationship between lessor and lessee and Smith, and the time of the notice that Chilean was having Smith perform the work, this issue should also have been presented to a jury.
 
 
 23
 We turn next to the discussions as to the responsibility of Chilean for the loss of the warehouse. In the first place, in the event that the jury should find that Smith was actually the agent of Bay Line in the performance of the repair work that caused the fire, then, of course, nothing under Section 4, even construed as it was by the trial court, would make Chilean liable for any of the damages suffered from the fire, because under these circumstances, damage would have been caused by an agent of Bay Line.
 
 
 24
 Moreover, even though it should be found that Smith was not acting as agent for Bay Line under the theory outlined above, we conclude that upon reading the contract in its entirety, a rule of construction universally applied, the parties undertook to cover the entire subject of a non-negligent loss by fire in paragraph 7 of the lease, and that the provision in paragraph 4 that the lessee should be liable for any damage to the buildings caused by any of its employees or agents related to damage other than by fire.
 
 
 25
 There was no attempt by either party to seek a construction of this contract by claiming it was ambiguous as to these paragraphs. There was, therefore, no parol evidence offered to resolve what was truly meant by the parties. We are, therefore, bound to look at the language itself. In light of the fact that under paragraph 7 lessor, who prepared the lease, stood the entire loss in the event of fire, it seems utterly inconsistent to construe the langauge in the last sentence of paragraph 4 as making the lessee liable for damage by fire, caused without negligence, for a fire of such origin would be no different in law than a fire caused by an act of God or other casualty. Once again, we repeat, we are not dealing with damage caused to the building by the negligent act of the lessee's employees. This construction does not deprive the sentence of all substance. There are many kinds of damage that could be caused to the building, dock and rail lines during the term of the lease by the employees or agents of the lessee other than causing the building to be burned down by fire. There is, therefore, a wide scope for application of the last sentence in paragraph 4 without the necessity of the court's holding that the fire loss was to be included within the language there notwithstanding the obvious intention of the parties to place the responsibility for fire loss in paragraph 7 on the owner of the property.
 
 
 26
 It must be stated again that we have here not dealt at all with the question of liability arising from any acts of negligence by Smith, whether as agent for Chilean or as agent for Bay Line. We have dealt only with the case decided by the trial court, which is (1) that the failure of the lessee to be able to return the machinery and equipment because it was burned while, as it must be assumed, the lessee was in good faith attempting to repair it (possibly to remedy a failure of the lessor), makes the lessee liable for the equipment, and (2) that Chilean is liable for the destruction of the warehouse because it was liable for damages to the warehouse caused by its agents, without having submitted to a finder of fact the question of whether Smith was really the agent of the lessor or lessee, and in spite of the fact that paragraph 7 must be construed to cover all eventualities arising under the terms of the lease in case a non-negligent fire caused either total or partial destruction.
 
 
 27
 In order that the trial court may submit the necessary issues of fact to the jury, it is necessary that the case be remanded. If there are elements of negligence for which Smith or Chilean may be liable, these issues, of course, can be presented at the same time.
 
 
 28
 We hold that the trial court could not grant summary judgment without determining whether the lessor had carried out its obligation as to the machinery and equipment before the lessee undertook to do the repair work to it, which brought about the fire, and that in any event, short of proof of common law negligence on the part of the lessee or its agents, Chilean cannot be held liable for the fire loss to the warehouse under the provisions of the last sentence in Section 4 of the lease.
 
 
 29
 The judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 '4. The Lessee (Chilean shall maintain and keep in repair the machinery and equipment listed in Schedule 'A' except that when ordinary repair shall not be sufficient to maintain such machinery and equipment, the Lessor (Bay Line) shall make replacement with equipment and machinery of the like kind and quality in good working condition. The Lessee, at the expiration of the lease, shall return in good condition, normal wear and tear excepted, all machinery, and equipment thus provided. The Lessee, however, shall not be obligated for any repairs to the building, dock and rail lines during the term of this lease, except that the Lessee shall be liable for any damage thereto caused by any of its employees or agents
 '7. In the event of a total or substantially total destruction of the said deck and warehouse by fire, storm or other casualty, the Lessor shall have the option of terminating the lease or of rebuilding the destroyed property within a reasonable time and in the latter event, the rent shall be proportionately abated during the period the Lessee is kept out of the use of the property. In the event the damage done in the dock or warehouse by any of such causes is less than substantially total and the Lessee is able still with reasonable effort to carry on operations, the Lessor shall, with reasonable promptness, repair the damage and there shall be no abatement of rent because of damage or loss to any appliances or fixtures belonging to the Lessee.'
 
 
 [2]
 'SEVENTH: The OPERATOR (Smith) shall not be obligated to make repairs to, or held liable for any damage to the warehouse, except those rendered necessary or caused by its employees or agents. The OPERATOR (Smith), however, shall maintain and keep in repair the machinery and equipment listed in Schedules 'A' and 'B' hereof, except that when ordinary repairs shall not be sufficient to maintain such machinery and equipment in good operating condition, the LEASEHOLDER may in its discretion make replacements thereof. The OPERATOR, upon the expiration or termination of this Agreement, shall return said machinery and equipment in good condition, reasonable wear and tear excepted.'
 
 
 [3]
 Of course, any damage suffered by Chilean on account of a delay in unloading the ship as to whose arrival on November 5 Bay Line was notified by letter, may well have to be borne by Bay Line, if it failed to carry out its part of the provision to pargraph 4 to replace the broken links, and damage was caused to Chilean in the nature of a delay resulting from such failure. Of course, under general principles, it was the duty of Chilean to mitigate these damages to the extent possible, if not in violation of other terms of the contract
 
 
 [4]
 Quaere? Under such circumstances, if no negligence is shown would not the landlord be estopped from recovery if the attempted 'repair' resulted in loss of the equipment? These issues are not now passed on because they were not reached by the trial court